466 F.2d 171
 In the Matter of Schokbeton Industries, Inc., Debtor.
SCHOKBETON INDUSTRIES, INC., Debtor, and
Arcrete, Inc., Appellants-Cross Appellees,
v.
SCHOKBETON PRODUCTS CORPORATION, Appellee-Cross Appellant.
 No. 71-2629 Summary Calendar.*
 United States Court of Appeals,
Fifth Circuit.
 Aug. 16, 1972.
 
 Edmund L. Cogburn, Houston, Tex., Melvin A. Dow, Dow, Cogburn & Friedman, Houston, Tex., for Arcrete, Inc.
 Jerry E. Bain, Tyner & Bain, Tyler, Tex., for Schokbeton Industries.
 Charles F. Potter, Tyler, Tex., Roby Hadden, U. S. Atty., Stanley D. Bynum, Robert R. Reid, Jr., Birmingham, Ala., for Schokbeton Products Corp.; Bradley, Arant, Rose & White, Birmingham, Ala., of counsel.
 Before JOHN R. BROWN, Chief Judge, and GOLDBERG and MORGAN, Circuit Judges.
 JOHN R. BROWN, Chief Judge:
 
 
 1
 Following an arrangement proceeding under Chapter XI of the Federal Bankruptcy Act, 11 U.S.C.A. Sec. 701 et seq., the District Court (i) disolved an injunction entered by the referee to restrain Schokbeton Products Corp. (Products) from terminating an exclusive licensing agreement with the debtor in possession, Schokbeton Industries, Inc. (Debtor),[1] and (ii) affirmed the referee's confirmation of the plan of arrangement. Debtor and Arcrete, Inc., an intervenor which proposes to operate Debtor as a corporate subsidiary after acquiring all of its capital stock, appeal from the dissolution of the referee's injunction. Products cross appeals from the order approving the plan of arrangement. We affirm.
 
 
 2
 On December 26, 1964 Products granted Debtor an exclusive franchise to manufacture and sell precast concrete construction materials in Texas and parts of Louisiana, utilizing Products' unique dry concrete production method ("the Schokbeton process"). The licensing agreement required Debtor to make periodic royalty payments in return for the exclusive franchise and also provided that any default in the payment of such royalties for a period of sixty days following receipt of written notice from Products would justify termination of the contract.[2]
 
 
 3
 On November 13, 1970 Products mailed written notice of default for nonpayment of royalties.[3] On December 8, 1970, before expiration of the sixty-day grace period for curing the default, Debtor filed a petition for an arrangement under Chapter XI. On January 16, 1971 Debtor was still in default and Products mailed a second written notice purporting to terminate the agreement. More than four months later, discovering that Products was attempting to grant its exclusive franchise to another licensee, Debtor sought injunctive relief from the referee on the theory that the Schokbeton process was its most valuable asset and that it would suffer irreparable financial damage if Products were permitted to disregard its license. The referee agreed and granted the injunction after concluding that the licensing agreement still subsisted as an asset of Debtor, that the filing of the arrangement petition postponed Debtor's obligation to cure the default in royalty payments, and that such default would be corrected "during an extended period as may be determined by this Court."
 
 
 4
 Debtor's Appeal: The Validity of the Injunction
 
 
 5
 We concede as indisputable the abstract assertion that the referee in a Chapter XI proceeding possesses plenary authority to protect the assets of a debtor in possession by means of an injuction. The jurisdiction is derived from a variety of sources-sections 2(a) (15)[4] and 372[5] of the Bankruptcy Act itself, the All Writs Act,[6] and the inherent equity powers of a court of bankruptcy. Continental Illinois National Bank & Trust Co. of Chicago v. Chicago, Rock Island, & pacific Railway Co., 1935, 294 U.S. 648, 675-676, 55 S.Ct. 595, 605-606, 79 L.Ed. 1110, 1128; 1 Collier, Bankruptcy, p 2.61 (14th ed. 1970). No one disputes the general proposition that the power is there and that it may be exercised in an appropriate situation.
 
 
 6
 But generalizations seldom provide satisfactory solutions to specific problems. The facts of this case present two sharply defined and interrelated questions. First, did the concededly pervasive authority of the referee permit him to preserve Debtor's contractual rights by indefinitely postponing the performance required by the terms of the contract (i. e. the payment of past due royalties)? We hold that it did not. Second, did the filing of the petition for an arrangement automatically extend the sixty-day period for curing the default? We hold that it did not.
 
 
 7
 Our conclusions are predicated upon the manifest Congressional policy that proceedings under Chapter XI incorporate, except where inconsistent, the principles applicable in bankruptcy proceedings generally, 11 U.S.C.A. Sec. 702. A debtor in possession is thus the practical equivalent of a trustee in bankruptcy, 11 U.S.C.A. Sec. 742, and so like the trustee usually acquires only those rights and assumes only those liabilities in existence when the petition is filed, 11 U.S.C.A. Sec. 110(a).[7]
 
 
 8
 In the present context the most significant example of this parallelism is the statutory option afforded both trustees in bankruptcy[8] and debtors in possession[9] to reject executory contracts. Given their identicality in this respect, the result here is almost foreordained because of the universally recognized rule that a trustee cannot accept the benefits of an executory contract without accepting the burdens as well. Hurley v. Atchison, Topeka, & Sante Fe Railway Co., 1909, 213 U.S. 126, 29 S.Ct. 466, 53 L.Ed. 729; Bank of America National Trust and Savings Association v. Smith, 9 Cir., 1964, 336 F.2d 528, 529; In re Italian Cook Oil Corp., 3 Cir., 1951, 190 F.2d 994, 997; 8 Collier, Bankruptcy, p3.15 . As a logical result, a trustee's decision to adopt such a contract following the filing of a bankruptcy petition does not preclude the exercise of the other party's pre-existing right to terminate the agreement. Thompson v. Texas Mexican Railway Co., 1946, 328 U.S. 134, 141, 66 S.Ct. 937, 942, 90 L.Ed. 1132, 1137; Finn v. Meighan, 1945, 325 U.S. 300, 301, 65 S.Ct. 1147, 1148, 89 L.Ed. 1624, 1626; Hewit v. Berlin Machine Works, 1904, 194 U.S. 296, 24 S.Ct. 690, 48 L. Ed. 986; Kirby v. United States, 10 Cir., 1964, 329 F.2d 735, 737; Urban Properties Corp. v. Benson, 9 Cir., 1940, 116 F.2d 321; In re Lindy-Friedman Clothing Co., 5 Cir., 1922, 285 F. 22; Empress Theatre Co. v. Horton, 8 Cir., 1920, 266 F. 657; Greif Bros. Cooperage Co. v. Mullinix, 8 Cir., 1920, 264 F. 391, 397; Lindeke v. Associates Realty Co., 8 Cir., 1906, 146 F. 630, 640; In re Little & Ives Co., S.D.N.Y., 1966, 262 F.Supp. 719; 8 Collier, Bankruptcy, p 3.15.[10]
 
 
 9
 Debtor attempts to distinguish these decisions by pointing out the fact that many of them[11] involved contracts that were by their own terms subject to termination upon the filing of a petition in bankruptcy. Since its agreement with Products explicitly provided that the mere filing of a Chapter XI petition would not terminate the contract (see note 2, supra), Debtor reasons that here contractual rights existed, were subject to the referee's equitable jurisdiction and were therefore enforceable on Debtor's behalf, whereas in the other cases the debtor could not change the fact that the petition had been filed (i. e. the defect was "non-curable").
 
 
 10
 We find the suggested distinction unpersuasive. In the first place the principle is in all instances the same-a contractual termination provision is unaffected by the filing of a petition in bankruptcy and may be enforced against the trustee or debtor in possession. In the second place there is no logical basis for distinguishing between the asserted authority of the referee to modify a contract by indefinitely extending the time for curing a default under it and equivalent authority to modify or nullify any other contractual provision. If a referee could grant relief on equitable grounds from compliance with a sixty-day grace period for paying past due royalties, he might as easily find it "inequitable" to enforce a forfeiture arising from the filing of a bankruptcy petition. In the third place, absent a concession of the referee's power to rewrite the contract between the parties, the grounds for termination here were as irreversible as those in each of the other cases. The sixty days elapsed. The royalties remained unpaid. Debtor's rights under the licensing agreement evaporated upon receipt of the written notice of termination, and neither the mere filing of the arrangement petition nor the referee's order purporting to "extend" the grace period for cure of the default nor a mystical combination of both could effect their recondensation.
 
 
 11
 Debtor's reliance on section 11(e) of the Bankruptcy Act is misplaced.[12] Obviously that statute permits a trustee, receiver or debtor in possession to avoid a statutory (and perhaps a contractual)[13] time limitation that would otherwise bar a claim asserted on behalf of the debtor. United States v. Paul Hardeman, Inc., M.D. Fla., 1966, 260 F.Supp. 723; Henkin v. Rockower Bros., Inc., S.D.N.Y., 1966, 259 F.Supp. 202. It provides no basis for suspending the debtor's obligations under an executory contract while simultaneously holding the other party to the bargain.[14]
 
 
 12
 Debtor's reliance on In the Matter of Lane Foods, Inc., S.D.N.Y., 1963, 213 F. Supp. 133 is grossly misplaced. That decision and others like it[15] stand for no more than the proposition that upon termination of a lease the referee may order that the debtor temporarily retain possession pending confirmation of the arrangement in order to avert the radical dislocation that would otherwise result from a forced eviction from the premises. More importantly, the Court in Lane Foods cites In re Walker, 2 Cir., 1937, 93 F.2d 281 to reaffirm the obvious fact that such an extraordinary holdover tenant has no more than equitable possession of the building. There is no contractual right to occupancy because the lease has already been terminated. Since the debtor was in possession, and since possession-rather than ownership or legal title-underlies the exercise of bankruptcy jurisdiction,[16] the temporary continuation of possession, contingent upon payment for such occupancy, 213 F.Supp. at 137, n. 12, was appropriate.
 
 
 13
 But the facts of the present case cannot be molded to fit within the Lane Foods doctrine. We do not doubt that in some circumstances intangible property rights are subject to "possession" by the debtor and therefore fall within the equitable jurisdiction of the referee. Katchen v. Landy, 1966, 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391; 2 Collier, Bankruptcy, p 23.05 . However, here it is plain that after January 16, 1971 Debtor had no rights in the franchise-intangible, contractual or otherwise-and hence could have "possessed" nothing when it applied to the referee four months later for protection of its "rights" under the licensing agreement. Even if the referee had acted earlier he still could not have given Debtor indefinite "temporary possession" of the franchise, with no more than a bare promise of some speculative future compensation for it. The filing of an arrangement petition under Chapter XI does not divest the debtor in possession of its contractual rights, but it likewise does not provide a blanket exemption from contractual obligations. Debtor's failure to satisfy those obligations justified Products' termination of the agreement.
 
 
 14
 Besides directly contradicting its position in the District Court (App. 172), Debtor's theory that Products' action was equivalent to the foreclosure of a lien subject to injunction under section 314 of the Bankruptcy Act, 11 U.S.C.A. Sec. 714, requires only two short answers: (i) the "foreclosure" was not enjoined until after it took place, and (ii) there was no "foreclosure."
 
 
 15
 Finally, Debtor Places great faith in our previous order reinstating the referee's injunction pending appeal (see note 1, supra). Obviously such interm relief was designed only to preserve the status quo pending final disposition of the issues by an appeal on the merits. This is it.
 
 
 16
 We do not over look the fact that in addition to providing a swift and economical method for facilitating simple compositions among relatively sophisticated unsecured cerditors,[17] a Chapter XI arrangement is even more vitally concerned with the ultimate rehabilitation of the debtor.[18] Nor do we disregard the referee's findings of fact that the loss of the exclusive franchise will seriously jeopardize Debtor's competitive position and cause it irreparable injury. We conclude that this is simply not a case for the invocation of high equity. Products' contractual right to terminate the contract clearly survived both the filing of the arrangement petition and the referee's belated attempt to resurrect an already moribund agreement. In such circumstances Debtor must live with its forfeiture.[19]Products' Cross Appeal: Confirmation of the Arrangement
 
 
 17
 Debtor strenuously argues that Products' cross appeal from the District Court's affirmance of the refereee's confirmation of the arrangement is merely a sham designed to delay implementation of the plan and to provide Products with a competitive advantage. In fact, Debtor is so firmly convinced of the frivolity of the appeal that it seeks the extraordinary relief of money damages and double costs provided by F.R.A.P. 38.[20] For several reasons we reject this approach.
 
 
 18
 In the first place Products' cross appeal is not altogether meritless. Debtor limits its attack almost exclusively to Products' argument challenging the voting procedure by which the creditors approved the plan of arrangement, correctly pointing out that Products apparently conceded the legitimacy of this procedure in a letter to the District Court.[21] But Products also contends that confirmation of the plan was intimately related to the continuing vitality of the licensing agreement, inasmuch as the arrangement contemplated extending Debtor's franchise for an indefinite period of time. Since the District Court's second order merely affirmed the referee's confirmation without specifically referring to the earlier dissolution of the injunction, Products had ample reason for initiating a protective cross appeal, particularly after Debtor sought review and reinstatement of the referee's injunctive order, which was granted (note 1, supra).
 
 
 19
 In the second place the disposition of these proceedings by means of two separate orders in the District Court may very well have left Products genuinely uncertain with respect to its legal obligation and liability under the licensing agreement. Any lingering doubts on that score may now be resolved because both orders have been appealed. Proceeding on the premise that the District Court's judgment is to be interpreted in light of its opinions, findings, and conclusions of law,[22] we hold that the most reasonable interpretation is also the correct one: the Court approved confirmation of the arrangement in all respects except as it provided for a perpetutation of the exclusive licensing agreement, which the Court held had been lawfully terminated by Products. That decision nullified anything to the contrary in the referee's order.
 
 
 20
 The injunction granted by this Court's order of September 27, 1971 is dissolved. The judgment of the District Court is affirmed in its entirety.
 
 
 21
 Affirmed.
 
 
 
 *
 Rule 18, 5 Cir.; see Isbell Enterprises, Inc. v. Citizens Casualty Company of New York et al., 5 Cir., 1970, 431 F.2d 409, Part I
 
 
 [1]
 This Court reinstated the injunction pending appeal. In the Matter of Schokbeton Industries, 5 Cir., 1971, 449 F.2d 321
 
 
 [2]
 "17. Right to Terminate by Licensor. If Licensee shall default in any of the terms, conditions and covenants undertaken by it under this Agreement and said default shall continue for a period of sixty (60) days after receipt of written notice of such default or if Licensee shall make a general assigment for the benefit of creditors or shall become or be adjudicated a bankrupt, or shall voluntarily file a petition in bankruptcy, or file an answer admitting the material allegations of a petition filed against it for an adjudication in bankruptcy, or shall, by reason of its insolvency, apply for or suffer the appointment of a receiver of its property and assets and such receiver so appointed shall not be discharged within sixty (60) days after his appointment, then in any such event Licensor shall have the right to terminate this Agreement by written notice to Licensee. This Agreement shall terminate upon the receipt of such notice, except with respect to all accrued and unpaid royalties. 'Bankruptcy' as used herein, shall not include proceedings under Chapters X or XI of the Bankruptcy Act
 "Failure to terminate this Agreement for any breach shall not be construed a waiver of the right to terminate for any continuation of such breach or for any subsequent breach of the same or dissimilar character." (Emphasis added.)
 
 
 [3]
 The exact amount of unpaid royalties is contested. While Products claims it is approximately $98,000, Debtor asserts this is only an estimate. For present purposes we need only point out that the fact of default in some amount is undisputed
 
 
 [4]
 Courts of bankruptcy are authorized to "make such orders, issue such process and enter such judgments, in addition to those specifically provided for, as may be necessary for the enforcement of the provisions of this title * * * ." 11 U.S.C.A. Sec. 11(a) (15)
 See also section 311, 11 U.S.C.A. Sec. 711, providing for exclusive jurisdiction of the debtor and his property.
 
 
 [5]
 "Upon the consummation of a proceeding under this chapter after confirmation of an arrangement, the court shall enter a final decree discharging the receiver or trustee, if any; closing the estate; and making such provisions, by way of injunction or otherwise, as may be equitable." 11 U.S.C.A. Sec. 772
 
 
 [6]
 "The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C.A. Sec. 1651(a)
 
 
 [7]
 "The trustee succeeds only to such rights as the bankrupt possessed; and the trustee is subject to all claims and defenses which might have been asserted against the bankrupt but for the filing of the petition." Bank of Marin v. England, 1966, 385 U.S. 99, 101, 87 S.Ct. 274, 276, 17 L.Ed.2d 197, 200 (emphasis added); Zartman v. First National Bank, 1910, 216 U.S. 134, 30 S.Ct. 368, 54 L.Ed. 418; Knapp v. Milwaukee Trust Co., 1910, 216 U.S. 545, 30 S.Ct. 412, 54 L.Ed. 610
 Of Course, this principle must be qualified to the extent that the trustee is invested with extraordinary powers by a specific provision of the Bankruptcy Act itself-for example, section 70(c), the so-called "strong-arm clause," 11 U.S.C.A. Sec. 110(c); 4A Collier, Bankruptcy, paragraphs 70.04, 70.47. But nothing in the Act specifically empowers either a trustee (debtor in possession) or a referee to extend unilaterally a contractual time limitation dictating a forfeiture if the debtor fails to perform.
 
 
 [8]
 "Withing sixty days after the adjudication, the trustee shall assume or reject any executory contract, including unexpired leases of real property: Provided, however, That the court may for cause shown extend or reduce such period of time. Any such contract or lease not assumed or rejected within such time, whether or not a trustee has been appointed or has qualified, shall be deemed to be rejected * * *." 11 U.S.C.A. Sec. 110(b)
 
 
 [9]
 "Upon the filing of a petition, the court may, in addition to the jurisdiction, powers, and duties conferred and imposed upon it by this chapter-
 (1) permit the rejection of exectory contracts of the debtor, upon notice to the parties to such contracts and to such other parties in interest as the court may designate * * * ." 11 U.S.C.A. Sec. 713.
 See also 11 U.S.C.A. Sec. 757 (Chapter XI arrangement may include provision for rejection of executory contracts).
 
 
 [10]
 Obviously this principle encompasses licensing agreements. In re Spitzel & Co., E.D.N.Y., 1909, 168 F. 156; 4A Collier, Bankruptcy, p 70.22
 
 
 [11]
 But not all of them. See, e. g., Lindeke v. Associates Realty Co., supra, involving a sequence of events similar to that in the present case
 
 
 [12]
 The second sentence reads as follows:
 "Where, by any agreement, a period of limitation is fixed for instituting a suit or proceeding upon any claim, or for presenting or filing any claims, proof of claim, proof of loss, demand, notice, or the like, * * * period of limitation is fixed, either in such proceeding or by applicable Federal or State law, for taking any action, filing any claim or pleading, or doing any act, and where in any such case such period had not expired at the date of the filing of the petition in bankruptcy, the receiver or trustee of the bankrupt may, for the benefit of the estate, take any such action or do any such act, required of or permitted to the bankrupt, within a period of sixty days subsequent to the date of adjudication or within such further period as may be permitted by the agreement, or in the proceeding or by applicable Federal or State law, as the case may be." 11 U.S.C.A. Sec. 29.
 
 
 [13]
 1 Collier, Bankruptcy, p 11.13, n. 17
 
 
 [14]
 We have carefully considered Debtor's argument on this point in the District Court (App. 167-170) and found it altogether specious
 
 
 [15]
 See, e. g., In the Matter of Program Aids Co., E.D.N.Y., 1969, 310 F.Supp. 198
 
 
 [16]
 Thompson v. Magnolia Petroleum Co., 1940, 309 U.S. 478, 481, 60 S.Ct. 628, 630, 84 L.Ed. 876, 880
 
 
 [17]
 Securities and Exchange Commission v. American Trailer Rentals Co., 1965, 379 U.S. 594, 606-607, 85 S.Ct. 513, 520-521, 13 L.Ed.2d 510, 518
 
 
 [18]
 Nicholas v. United States, 1966, 384 U.S. 678, 687, 86 S.Ct. 1674, 1681, 16 L.Ed.2d 853, 861
 
 
 [19]
 For some reason unknown to us Products has apparently acquiesced in Debtor's continued use of the Schokbeton process under its arrangement with Arcrete and seeks only the right to franchise a competitive licensee and Debtor's discontinuance of the use of the trade name. Arcrete appears willing to participate on that basis
 
 
 [20]
 "If a court of appeal shall determine that an appeal is frivolous, it may award just damages and singler or double costs to the appellee." See Commercial Wholesalers, Inc. v. Investors Commercial Corp., 9 Cir., 1949, 172 F.2d 800; McCray v. Sapulpa Petroleum Co., 8 Cir., 1929, 31 F.2d 437
 
 
 [21]
 We do not consider Products' theory that the method of securing voting acceptances was defective, not because it is frivolous or because Products misrepresented its position before the District Court, but because it obviously has no standing to raise the point. Products' argument is that one member of a separate class of unsecured creditors may eventually recover a larger pro rata share of its claim than creditors generally. Even so, Products is not aggrieved, since it is not a member of that class. Cf. In re Michigan Ohio Building Corp., 7 Cir., 1941, 117 F.2d 191; Milgram v. Loew's, Inc., 3 Cir., 1951, 192 F.2d 579, 586
 
 
 [22]
 Great Lakes Dredge & Dock Co. v. Huffman, 1943, 319 U.S. 293, 295, 63 S.Ct. 1070, 1071, 87 L.Ed. 1407, 1409