**In the Matter of BENRUS WATCH COMPANY, INC., Debtor.**

**Bankruptcy No. 81–B–10891.**

United States Bankruptcy Court, S. D. New York.

Aug. 19, 1981.

---

Russo, Weintraub, Lombardi & Frucco, White Plains, N. Y., for debtor; Charles Weintraub, White Plains, N. Y., of counsel.

Whitman & Ransom, New York City, for Wells-Benrus Corp.; William B. Kahn and Howard Berman, New York City, of counsel.

Finkel, Goldstein & Berzow, for the Official Creditors Committee; Harvey R. Goldstein and Neil Rosenbloom, New York City, of counsel.

## OPINION

ROY BABITT, Bankruptcy Judge:

This dispute centers on an agreement which pre-dated by nearly four years the successful reorganization of Benrus Watch Company, Inc. (Benrus Watch or debtor) in the scheme of Chapter 11 of the 1978 Bankruptcy Code, 11 U.S.C. (1976 ed. Supp. III) §§ 1101 *et seq.* Benrus manufactured and marketed watches under the trade names "Benrus" and "Sovereign", a right it had pursuant to a license agreement with Wells-Benrus Corporation (Wells). It is this license agreement which Wells insists had been terminated prior to the April 24, 1981 filing of Benrus' Chapter 11 petition by reason of defaults on the debtor's part, defaults which the debtor now says, among other things, were insufficient to support termination.

The relationship began on October 1, 1977 when Wells and Roka Watch Co., Inc. (Roka), a corporation owned and controlled by Mr. and Mrs. Robert Kauderer, entered into a joint venture agreement pursuant to which Benrus Watch was created. The Kauderers and Robert Romano, president of Wells, were elected directors. These parties to the agreement were each issued fifty percent of the shares of stock in Benrus Watch. On that same date, Benrus Watch, Wells, Roka and Roza Watch Corp. entered into a license agreement which granted the debtor the exclusive right to the use of the trademark and trade names subject to, *inter alia*, the payment of royalties in accordance with the terms of the contract.

By January, 1981, the debtor was in arrears for a substantial royalty payment, the exact amount of which is in dispute.[1] On January 14, 1981, in accordance with Paragraph 13a, the termination provision of the license agreement,[2] Mr. Kauderer was notified by Wells' counsel of the debtor's default and of Wells' intention to pursue its remedies under the contract if such default were not fully cured within thirty days. No payment was made and on March 16th Mr. Romano sent a letter to Benrus Watch, to Mr. Kauderer's attention, advising him that the contract had been terminated.[3] The Chapter 11 petition followed, and four days later Benrus Watch applied to this court for a judgment declaring the termination invalid and authorizing the debtor to sell its inventory. To prevent loss, such sale was authorized. Thereafter, Wells submitted an application for judgment declaring the license terminated on March 16, 1981, and enjoining the debtor from manufacturing or selling watches bearing the disputed trademark and communicating with any customer of Wells.[4]

This court, then, is asked to render a declaratory judgment adjudicating the rights of the parties on the documentary evidence. As the parties dispute the proper construction of the contract, the court must look to the terms of the agreement as controlling, for there are no claims that the agreement is not fully integrated.

In general, the terms of a contract should be construed according to their plain and unambiguous meaning. *Vogel v. Tenneco Oil Co.*, 465 F.2d 563, 565 (D.C.Cir. 1972). Paragraph 13(a) clearly states the procedure for terminating the agreement in the event of a breach by the licensee. The debtor challenges the termination by contending that the January 14th letter was insufficient notice to commence the start of the thirty day period. The debtor comes to this by observing that this notice was given by Wells' attorney, not a party to the agreement. This argument that counsel is not an

---

1. Wells alleges in its application that approximately $700,000 in royalties were due.

2. Paragraph 13(a) provides:
"If licensee shall violate any of the obligations under this license agreement, licensor shall have the right to terminate the license hereby granted by giving notice of such termination of licensee, unless such breach is cured by licensee within 30 days after receiving written notice of such breach from licensor. Termination of the license hereby granted shall be without prejudice to any rights or remedies which licensor may otherwise have against licensee. Upon the termination of this agreement or of the license hereby granted, notwithstanding anything to the contrary herein contained, *all minimum guaranteed royalties and all royalties for sales theretofore made shall become immediately due and payable and no advance guarantees shall be repayable.* In such event all advance payments of royalties exceeding royalty payments actually payable with respect to minimum guaranteed royalties and royalties on sales theretofore made shall be refunded to licensee, and all promissory notes held with respect to minimum royalties due after such date of termination shall be returned to licensee, and the escrow agreement shall so provide." (Emphasis added)

3. It should be noted that Wells gave Benrus Watch sixty days before actually terminating the agreement.

4. Wells then entered into a separate license agreement with Clinton Watch Co. which later purchased some of the debtor's remaining inventory. The three parties have since entered into a settlement stipulating that for all purposes other than the present dispute as to termination and in order to preserve the value and goodwill of the "Benrus" and "Sovereign" names, Clinton Watch Co. has the exclusive right to these trademarks.

authorized agent to notify of default is totally without merit. Most frequently it should be counsel who appraises the facts given by his client, who applies those facts to the words the parties wrote in their agreement, and who can determine from the instrument whether the requisite events have occurred. It is plain from the undisputed facts here that the notice was given in conformity with the termination provision and that the default in royalty payments constituted a breach within the terms of the contract to support termination. It is a settled principle of law that a contractual termination provision survives the filing of a petition in bankruptcy and neither a trustee nor a debtor in possession acquires any rights to otherwise alter the terms of the contract or to revive it. *Thompson v. Texas Mexican Railroad Co.*, 328 U.S. 134, 66 S.Ct. 937, 90 L.Ed. 1132 (1946); *Schokbeton Industries, Inc. v. Schokbeton Products Corp.*, 466 F.2d 171 (5th Cir. 1972); *In re Luce Industries*, 4 C.B.C.2d 355 (S.D.N.Y.1981). In short, contracts that have been effectively terminated prior to the filing of a Chapter 11 petition cannot be revived by the bankruptcy court. *In re Beck*, 5 B.R. 169 (Bkrtcy., D.Hawaii 1980). In that case, pursuant to contractual rights, the licensor gave notice to the licensee that the license would terminate in sixty days. The Chapter 11 petition was filed prior to the end of this period. The court held that the filing did not prevent termination inasmuch as nothing but the passage of time remained to complete the termination. The automatic stay did not bar this termination. It should be emphasized that the default here relied on as the predicate of termination is not the filing of the debtor's Chapter 11 petition. Benrus Watch refrains, and wisely so, from seizing on the filing itself as the default event, something denounced in the 1978 Code. 11 U.S.C. (1976 ed. Supp. III) § 365(b)(2).

Sensing that it must be where its contract put it, and ignoring the focus of this decision as an exercise in the law and not one in equity, processes which do not always lead to the same place, *In re Borgenicht*, 479 F.2d 150, 153 (2d Cir. 1973), the debtor raises a number of equitable defenses to the termination. First, it is said that because the joint venture agreement was never terminated, Wells continues to own 50% of the debtor's stock and is therefore equitably estopped from terminating the contract. It also points to the fact that Wells' director continued to serve on the board of Benrus Watch after the notice of default was served. The debtor seems to place emphasis on the mere fact of the relationships as a defense although it does hint at some breach of some unexplained fiduciary duty. But the relationships were pivotal to the formation of the debtor and to the licensing agreement. There is simply nothing in this record to taint the licensing agreement. As a matter of business judgment, Wells thought it prudent that it become a stockholder of the newly formed Benrus Watch and that its Mr. Romano serve on the board with the Kauderers. There is no showing of overreaching or self-dealing by Wells. The default is clear and the termination proper and justified. In short, the events here were intrinsically fair and the debtor's defense on the ground that breached contracts must be enforced, notwithstanding breach where relationships are as here, is patently without merit.

Similarly, the debtor's corollary assertion that it possesses an equitable interest in the trademark property simply by virtue of its relationship with Wells is without merit. A joint venture corporation functions as a separate entity and has no inherent ownership interests in the assets of the companies that formed it.[5]

Nor is this court persuaded that somehow it should find some compelling reason to exercise its equitable discretion and allow the debtor to operate under a

---

5. A joint venture corporation is controlled by principles of corporate law. H. Henn, *Law of* *Corporations* § 49 (2d ed. 1970).

revived license agreement despite its legal termination. The holdings in the cases cited by the debtor are inapposite. Such equitable power has usually been exercised in cases decided under the 1898 Act where the facts militated against enforcing a termination grounded in the filing of a petition in the bankruptcy court. See *Weaver v. Hutson*, 459 F.2d 741 (4th Cir. 1972); *Queens Boulevard Wine & Liquor Corp. v. Blum*, 503 F.2d 202 (2d Cir. 1973); and compare *In re D. H. Overmyer Co., Inc.*, 510 F.2d 329 (2d Cir. 1975).

The debtor cites *In re Bronx-Westchester Mack*, 4 B.R. 730, 731 (S.D.N.Y.1980) as supporting its view. But the facts and equities of that case are distinguishable from those here. In *Mack*, the debtor had delayed filing a petition under which he would have had the advantage of the automatic stay of 11 U.S.C. § 362, because he expressly relied on the licensor's promise to delay enforcement of the termination of their distributorship agreement. *Mack Truck Inc.* then served the termination notice prior to the agreed upon date. Judge Schwartzberg of this court held Mack Truck estopped from asserting the effectiveness of the termination notice under the principle of equitable estoppel. Nothing in this dispute is shown to support such drastic recourse to defeat Wells' legitimate rights under its bargain with the debtor.

The debtor's second issue concerning its right to sell inventory under the terminated license agreement became moot during the Chapter 11 process which led to confirmation of the plan. There is, therefore, nothing more to be said concerning this prong of the debtor's application.

Wells is entitled to a declaratory judgment that its agreement with the debtor had been terminated by reason of material pre-Chapter 11 petition breach.

Settle an order.